ANDREW J. VAN BLARCOM, trustee in bankruptcy, &c.,

v.

STEWARD H. HOPKINS.

[Submitted April 30th, 1902. Decided June 7th, 1902. Filed October 11th, 1902.]

Where a town lot is sold at a judicial sale under an advertisement which describes it as being one hundred feet front and two hundred and fifty-five feet deep, while it is only ninety-three feet front and two hundred and fifty-five feet deep by including the sidewalk, but the misrepresentation was innocent and the purchaser was well acquainted with the lot, though he did not know that it was not as large as represented in the advertisement, and he was not buying it for a purpose requiring such

an exact area, and there is nothing in the case to lead to the conclusion that he would not have bought if he had known the exact dimensions, he will be required to specifically perform his contract, with a deduction in price for the deficiency in quantity.

On bill for specific performance. On final hearing on bill, answer and proofs in open court.

*Mr. Charles D. Thompson,* for the complainant.

*Mr. Charles M. Woodruff,* for the defendant.

PITNEY, V. C.

This is a suit to compel the specific performance of a contract, brought by the complainant, Van Blarcom, as vendor, against the defendant, Hopkins, as vendee. The making of the contract is admitted. The specific and only defence set up is that the quantity of land contained in the proposed conveyance is not as great as that provided for in the contract.

The circumstances of the case are somewhat peculiar, and are as follows:

The premises in question comprise the house and lot which constituted the residence of the late Thomas Kays, situate on Main street, in the town of Newton, and a few hundred feet from its business centre. They were owned and occupied by Mr. Kays for many years, and came under the dominion of the complainant by virtue of voluntary proceedings in bankruptcy, in which he was appointed trustee. An order for their sale was made, and they were duly advertised for sale at auction, and purchased thereat by the defendant. He is, and has been for many years, a resident of Newton, living on the same street, but a little farther away from the town than the premises in question, and passed them habitually two or three times a day. He was looking for a lot affording more ground and room for building, and when he saw the premises advertised called on Mr. Kays, looked through the house and over the grounds, and learned from Mr. Kays that he contemplated bidding upon the premises himself; that he would bid openly, and that when he

stopped bidding would so announce to the public, so that all persons would know whether they were bidding against him or not.

The advertisement was prepared by Mr. Kays and handed to his trustee. The description of the premises contained therein is as follows:

"The residence of Thomas Kays, situate on Main street, Newton, New Jersey, is one of the most desirable locations in Newton. The lot is a large one. *It is one hundred feet front and two hundred and fifty-five feet deep.* The house is three stories; all in good repair."

Then followed a description of the different stories, heating apparatus and other matters.

Mr. Kays did bid at the sale openly, and his last bid was followed by others, and the property was knocked off to the defendant for the sum of $7,020, which is a fair price for the property, and he signed the usual undertaking to accept a conveyance and pay the purchase-money after the confirmation.

After the sale, and before it was confirmed, Mr. Kays died.

The property had been sold expressly subject to the inchoate right of dower of Mr. Kays' wife, as she was at the time of the sale, and by the death of Mr. Kays that right became vested in possession before the conveyance could be delivered.

The deed was prepared and shown to the counsel of the defendant, who examined it and found that the front of the lot as described in the deed was one chain and thirty-six links, or a trifle less than ninety feet. That description was taken from the conveyance under which Mr. Kays had held and occupied the premises for many years. Mr. Hopkins at once declined to take the title on account of the deficiency of eleven feet in the frontage of the lot. It was also found, upon measurement, that the distance from the front fence to the rear fence was only about two hundred and forty-seven feet, instead of two hundred and fifty-five feet; but measuring to the edge of the sidewalk it was fully two hundred and fifty-five feet, and still more to the centre of the street. In looking up the matter the trustee found that a small piece of land adjoining the original lot on the west, and included within its present enclosure, had been

omitted in his deed. This small piece was part of the lot adjoining Mr. Kays' original lot on the west, which later lot he had purchased after the purchase of the original lot and had reconveyed, reserving the small piece in question. The complainant immediately proposed to include that small piece in the conveyance, but the defendant declined to accept it.

With that small piece included the front is ninety-two and eight-tenths feet by actual measurement, and a measurement on a line drawn immediately through the rear part of the dwelling-house, sixty feet from the street, makes the width of the lot at that point just ninety feet, and at the rear of the lot it is about ninety-three feet, besides a small parallelogram, seven by forty-two feet, which is annexed on one side in the rear, which makes the whole width there a trifle over one hundred feet.

The lot is enclosed in fence in the rear, sides and front, except that part of the east side between the dwelling and the street. The dwelling touches, in part, the easterly side of the lot, and from the point of such contact the easterly line runs directly past the house and strikes the street about twenty feet in front of the house, and the street end of the line between Kays' lot and the next lot on the east of it is clearly marked by a post, and by a difference which clearly appears in the character of the front fence of the Kays lot and that of the lot on the east. Besides, while there is no fence for a distance of a few feet at that point, the location of the division line between the lots is marked by a small terrace. On the west side the boundary, for about one hundred feet from the street, is the building on the adjoining property.

The result is that a person looking at the premises, either passing along in front or walking over them, would have no difficulty whatever in seeing precisely where the lines were, so that the thing sold was visible on the ground, and no intending purchaser could make a mistake in what he was buying.

Evidence was given, on the part of the defendant, to the effect that he had in mind before making this purchase a lot of about one hundred feet front and of proportionate depth. The house lot which he occupied was seventy feet front and one hundred and sixty feet deep, and was not large enough for his wants.

He gave evidence tending to show that he had consulted a builder or architect as to what disposition could be made of the house already on the premises; whether he should use that house and move it into a central position on the lot, or whether he should move it off and build a new house. But there is no evidence tending to show that he had in mind any improvements which would require a lot just one hundred feet in width, or that the lot he purchased was not large enough to satisfy the design for the residence which he had in his mind. In other words, nothing in the evidence tends to show that there was a particular charm in just the width of one hundred feet, or that he would not have bid upon and become a purchaser of the lot if its actual dimensions had been made known to him.

It was further shown by Mr. Van Blarcom that he knew nothing about the dimensions of the lot; had never had the muniments of title in his possession; that the description for the advertisement was prepared for him by Mr. Kays, and that he supposed it was quite accurate. It was further admitted that Mr. Kays was entirely innocent in regard to the description that he prepared; that he must have supposed that the lot was one hundred feet wide, although if he had made a calculation from the calls—one chain and thirty-six links—in the deed he would have discovered that it was only about ninety feet.

The defendant relied entirely upon the statement in the advertisement, and also, as he swears, upon Mr. Kays' personal statement to him that the lot was one hundred feet wide, and made no examination either of the title or of the description of the lot in Mr. Kays' muniments of title; and, as he swears, never suspected that there was any deficiency until he, with his counsel, read the description.

It was shown that the bare land was worth about $50 a front foot, with the result that the lot was worth about $500 less than it would have been if it had contained the full width of one hundred feet.

Mrs. Kays is about sixty-seven years old, and her right of dower is a serious burden on the premises, and if the trustee must again expose them for sale he will be at a disadvantage, because what was at the previous sale a mere inchoate and un-

certain right, depending upon Mrs. Kays surviving her husband, has since become a fixed and present right.

Under these circumstances the questions are, Is the complainant entitled to specific performance at all; and, if so, shall it be upon terms of making compensation, or without making compensation? The vendor contends the latter. He argues that the defendant acquires the very thing which he saw and expected to acquire. It was an object which he could take in, as it were, with his eye, with which he was perfectly familiar, and that he could not have been misled by the representation set out in the advertisement.

On the other hand, the defendant argues, with great force, that he is not getting the thing that was promised to him, which was a lot one hundred feet wide and two hundred and fifty-five feet deep, and that, unless he has precisely that thing, he cannot be compelled to perform the contract upon any terms; that he could not distinguish between ninety-three feet and one hundred feet by the eye, and was entitled to rely upon the statement in the advertisement.

I am inclined to the opinion that neither of these positions is tenable; that the true solution of the problem is that the defendant should be compelled to specifically perform, with compensation made for the deficiency in quantity.

Specific performance with compensation for deficiency is a common remedy, and, I think, a valuable one. It is applied freely in cases where the vendee asks specific performance against the vendor with a deduction in the contract-price on account of the deficiency. On the other hand, it is given rarely in cases like the present, where the vendor is seeking to enforce the contract.

It is sometimes stated by judges that there is a general rule that specific performance with compensation will be decreed in favor of vendee and against vendor, but will not be decreed in favor of the vendor against the vendee. I do not find this position sustained by actual decisions. There is, in my judgment, but one rule of universal application in such cases, and that is, to inquire what, under the circumstances of the particular case, is equitable and just as between the parties. In

solving the question resort is had, as in other cases in equity, to the decisions of other judges in similar cases and the reasons they have given therefor.

Lord Selborne is reported to have said that "specific perform-ance is a conscious attempt, on the part of the court, to do complete justice to both parties with respect to all judicial rela-tions growing out of the contract between them."

Professor Pomeroy deals with this branch of the general sub-ject in section 434 *et seq.* of his treatise on "Specific Perform-ance." In section 434 he speaks of three alternatives presented in a case of a deficiency in quantity, quality or value—*first,* to refuse the remedy entirely; *second,* to enforce the contract with-out any regard to the partial failure, compelling the purchaser to take what there is to give and to pay the full price as agreed, or *third,* to decree a conveyance of the vendor's actual interest, and allow to the vendee a pecuniary compensation or abatement from the price, proportioned to the amount and value of the defect in title or deficiency in the subject-matter. The third alternative, he says,

"is based upon equitable principles; it endeavors to preserve the rights of both the parties and is therefore constantly resorted to and applied by courts of equity in aid of a vendee, *and sometimes, although under more and greater restrictions, in aid of the vendor.* There are circumstances, however, under which even a vendee is not allowed to avail himself of its doctrine."

In section 450 he states the doctrine applicable to the present case, to wit, a deficiency in quantity, as follows:

"Two rules are equally well settled by courts of equity. If the vend-or's failure to comply with the terms of the contract, either with respect to a defective title or a deficiency in the subject-matter, is not material, but is rather formal in its nature, so that the purchaser will get *substan-tially* what he contracted for, then the vendor can obtain a decree for a specific performance, with compensation, even against an unwilling ven-dee. If, however, the inability of the vendor to fulfill on his part affects a material part of the contract, if the defect in his title or the deficiency in the subject-matter is substantial, and not merely a failure to literally comply with the exact terms of the agreement—in short, if the vendee will not get substantially what he contracted for, then the vendor will not be permitted to enforce such a partial performance, even with compensa-tion upon an unwilling purchaser."

And he supports the doctrine by copious citations of authorities.

And again, at section 454, he says:

"If the land is sold, not by the number of acres, but by metes and bounds, or by means of any other similar description which identifies the particular tract, and the vendee receives a conveyance of that very tract, then, in the absence of intentional misrepresentation by the vendor, a deficiency in the quantity which the vendee had supposed the land to contain, even though that quantity was named in the agreement, will not affect the vendor's right to a specific performance, or entitle the purchaser to compensation, unless the deficiency should be so great as to virtually defeat the purpose for which the contract was entered into by the vendee. This, of course, assumes that the purchaser was not misled, and that he had opportunities for becoming acquainted with the subject-matter, and then the principle *caveat emptor* applies to a purchase of land as well as of chattels. But if the seller has misstated the quantity or number of acres, the vendee is plainly entitled to compensation for the deficiency."

There is a large class of cases which is clearly distinguishable from the present, namely, where the land agreed to be conveyed consists of several parcels and the title fails to some one of those parcels, so that the purchaser does not acquire the very thing which he purchased. An example of this class is *Arnold* v. *Arnold, L. R. 14 Ch. Div. 270 (1880)*. There a gentleman bargained to purchase a tract of land containing forty-one acres, adjoining his own land, one parcel of which, containing seven acres, comprised the whole front of the lot upon the street, and to this part the complainant was not able to make a complete title. Sir George Jessel, master of the rolls, decreed specific performance, but the court of appeal, consisting of Lord-Justices James, Baggallay and Bramwell, reversed, and refused a specific performance, holding that the strip of land to which title failed was, upon the evidence, an important part of the purchase, without which the purchaser would not have contracted to buy.

There are other cases, however, found in the English reports where such contracts have been enforced against the defendant, with compensation. Several are collected by Lord-Justice Fry in his book. *Fry Spec. Perf. (3d ed.)* § *1194.*

It is, of course, much more difficult in cases of that character to show that the purchaser would really acquire what he bargained for than in cases of a mere deficiency in quantity.

But in cases like the present, where the purchaser acquires the precise piece of land for which he contracted, and which he saw and inspected, and the only objection is that it was less in quantity than it was represented to be, the courts have, naturally enough, found little difficulty in giving the vendor his remedy against the vendee.

A recent example in England is found in the case of *In re Contract between Fawcett and Holmes, L. R. 42 Ch. Div. 150 (1889)*. There the sale was by the executor of a Mr. Fawcett (a builder) of the testator's residence, and was described as follows:

"All that messuage or dwelling-house situate in Teall street, Wakefield, with the builder's yard, stables, and premises as lately in the occupation of George Fawcett, and containing 1372 square yards."

The contract contained a provision, quite common of late years in England, and which was present in *Arnold* v. *Arnold, supra,* that in case of any error or misstatement or omission in the plans or particulars, the same shall not annul the sale, but, if pointed out before the completion of the purchase, and not otherwise, compensation shall be allowed by the vendor or purchaser, as the case may require. It appeared that the original purchase by Mr. Fawcett did contain one thousand three hundred and seventy-two square yards, but he had, long before his death, conveyed out three hundred and thirty-nine square yards, reducing his own plot to one thousand and thirty-three square yards, which was the amount comprised within the walls of the enclosure, which the purchasers saw upon inspection.

In delivering judgment in favor of the complainant, Lord Esher (at *p. 156*, bottom) says: "I think that, in *Flight* v. *Booth, 1 Bing. N. C. 370,* Tindal, C. J., lays down a rule which is easy to be understood, though often difficult of application: 'In this state of discrepancy between the decided cases, we think it is, at all events, a safe rule to adopt that where the

misdescription, although not proceeding from fraud, is, in a ma-terial and substantial point, so far affecting the subject-matter of the contract that it may reasonably be supposed that, but for such misdescription, the purchaser might never have entered into the contract at all, in such case the contract is avoided altogether, and the purchaser is not bound to resort to the clause of compensation.' This is a negative proposition, but a pregnant one. If the error is of such consequence that it may be reason-ably supposed· that, but for the misdescription, the purchaser would not have bought,. the error is not within the condition. In each case therefore the question depends on the view of the· court as to the importance of the misdescription. Is, then, the error in the present case such as to fall within the rule laid down by Tindal, C. J.? The subject-matter here is 'all that messuage or dwelling-house situate in Teall street, with the· builder's yard, stables, and premises as lately in the occupation of G. Fawcett.' Is the erroneous addition 'and containing 1,372 square yards,' material to the substance of the contract? Look-ing at what was described to the purchaser, did he get substan-tially what he contracted for? Did the misdescription go to the· essence of the contract and materially alter the substance of it? I agree with Mr. Justice North that it did not, and the mis-description is therefore within the condition, and the purchaser must complete, with compensation."

These two cases (*Arnold* v. *Arnold* and *Fawcett* v. *Holmes*), in which the contracts had the same clause providing for com-pensation, illustrate the rule guiding the courts in these cases, and show that, after all, the compensation clause in the contract has little effect upon the result.

In the same direction is *Whittemore* v. *Whittemore,. L. R. 8 Eq. Cas. 603 (1869)*, where the quantity of square yards in the parcel sold was stated at seven hundred and fifty-three, instead of five hundred and seventy-three—a clear clerical error.

Other examples of specific performance at the instance of the vendor against the vendee are as follows:

*King* v. *Wilson, 6 Beav. 124,* decided by Lord Langdale. There the contract was to sell a piece of property in Islington, London, stated in the particulars to be forty-six feet in depth.

In fact, the depth was only thirty-three feet. There the vendor insisted upon a conveyance without compensation, because the vendee was in possession and knew the depth; but that argument did not prevail, and the vendee was allowed compensation. *McQueen* v. *Farquhar, 11 Ves. 467; Scott* v. *Hanson, 1 Russ. & M. 128.*

*Winch* v. *Winchester, 1 Ves. & B. 375.* There the only question was whether the defendant was entitled to an abatement on account of a deficiency in quantity of the land. It was sold for forty-one acres, but on measurement only had thirty-six. *Dyer* v. *Hargrave, 10 Ves. 505.*

*King* v. *Bardeau, 6 Johns. Ch. 38,* decided by Chancellor Kent in an opinion in which he reviews all the authorities down to that date, is instructive. That was a case of vendor against vendee, and the lands sold were two lots adjoining each other, one of which was vacant and the other had a dwelling upon it, and the dwelling was represented to be wholly on the one lot, whereas, in point of fact, it encroached upon the other. Chancellor Kent enforced the contract, with an allowance by way of compensation for the difference in value by reason of the house encroaching on the line of one of the lots.

The leading case in New Jersey, and one relied on by the defendant, is *Miller* v. *Chetwood, 1 Gr. Ch. 199,* decided by Chancellor Pennington in 1839. That, like the present, was a bill by vendor against vendee to compel the specific performance of a contract to convey a plot of vacant land in the vicinity of the town, as it was then, of Elizabeth. It was made during the excitement due to speculating in town lots for which that period was famous. The property was represented to contain about nine acres, and when it came to be surveyed it really contained only six acres, and it was sold, not by the acre, but by the lump. Of the representation the chancellor says (on *p. 206*): "The fact, then, I consider established that the complainant did represent to the purchaser, at the time of the sale, that there were about nine acres, when, in truth, there were but six and sixteen-hundredths of an acre. How far this misrepresentation was willfully made it is not, perhaps, necessary for me to decide, but I

Van Blarcom *v.* Hopkins.

could wish there was less reason from the evidence to think that it was so made." But it is impossible to read the remainder of the opinion without feeling that he treated the misrepresentation as a willful one, and as the land was purchased to be cut up into building lots, the quantity was of the utmost importance. Thus he says (on *p. 208*) : "The general principles, which I extract from the cases, are that, on a bill for a specific perform- ance, the court will grant its aid or not; *according to the justice of the case;* and that it will never interfere when the party has practiced any fraud or been guilty of misrepresentation in any material particular. In the present case it is insisted that the quantity of land was not material; that the purchaser bought by the lot or parcel, and not by the acre; and that, as the land was before his eyes, and subject every day to his observation, he could not have been imposed upon. The plain answer to all this argument is that it can furnish no excuse to the complainant for his misrepresentation. He was bound to declare the truth at any rate, and not having done so, I cannot say, accord- ing to the case in Saxton, that he comes here 'with perfect pro- priety of conduct.' But can it be pretended that, in the purchase of a vacant lot, it makes no difference to the purchaser whether it contains six or nine acres? The defendant has said, in his answer, that he never would have purchased, at the price he gave, had he not relied on the quantity of nine acres, as stated by the complainant, *and he offered to fulfil his contract if a rebate was made for the deficiency in acres.* It is true the de- fendant saw the lot daily, but the eye cannot tell the number of acres. We may be greatly deceived. The defendant went into this agreement, undoubtedly, with too much haste; he should have surveyed the land; but still it can furnish no justification for the complainant."

It thus appears that the case has no application here, for the reason that the vendee was willing to fulfil, with compensation, and the vendor refused to do so.

The present case is further distinguishable from *Miller* v. *Chetwood* in that it was, as I have said, conceded that the mis- representation was made in entire ignorance and innocence by

the complainant, and also by Mr. Kays. And one cannot but re-mark that there was no imaginable reason why Mr. Kays should misrepresent the size of his lot; he himself expected to be a pur-chaser, and would, on that account, not be expected to exaggerate its value. On the other hand, he was a highly honorable and strictly honest man, and he intended, undoubtedly, to do full justice to his creditors, and for that purpose he prepared and handed to his trustee a full, and, what he believed to be, an accurate, description.

I have gone through all the New Jersey cases cited by the counsel for the complainant, and find none which makes more strongly in his favor than *Miller* v. *Chetwood.* The latest is *Melick* v. *Cross,* decided January 11th, 1902, by Vice-Chancellor Emory, and reported in *17 Dick. Ch. Rep. 545.* That was a bill for specific performance by the vendee, and a cross-bill, with the same prayer, by the vendor. The defect was a reservation by a prior owner of the property of a water-right in the tract, and the prayer of the vendee was that he should either have the specific performance free and clear of the reservation, or have his money returned to him. The learned judge held that, under the facts of the case, the vendee complainant had waived the defect, and a decree was made in favor of the defendant against the complainant for specific performance, with compensation. There were other complications in the case, but it is sufficient to say that the precise question here involved was not there passed upon.

An examination of all the authorities leads me to the con-clusion that the rule has been stated with reasonable accuracy by Professor Pomeroy, as above quoted.

Applying that principle to the facts of this case, I come to the conclusion that there is nothing to warrant the idea that the defendant would not have purchased if he had known the true width of the lot, and that the case is subject to the same con-siderations which influenced the court in the cases of *Whitte-more* v. *Whittemore* and *Fawcett* v. *Holmes,* above cited. In both cases the purchaser saw just what he was buying, and would acquire, by the deed, just what he saw and thought he was buying, and the misrepresentation as to the quantity was

innocent, and it is plain that the court, in each case, believed that had the true quantity been stated the purchaser would still have bought.

And yet it must be taken into account that the plot of land which the defendant will here get is not of as great a value as it would have been if it had been of the size mentioned in the description. This seems to me to make it a plain case for specific performance, with compensation.

There was little dispute as to the value, namely, $50 per front foot, irrespective of the building. The actual frontage is ninety-two and eight-tenths feet, and that width extends back about sixty feet; then there is a jog, reducing the width to ninety feet, and then the width increases again, as we have seen, to the rear of the lot. I shall treat it, however, as having a frontage of only ninety feet, and allow the defendant $500 from the price bid; but that sum must be subject to a deduction on account of the widow's right of dower, which, at her age, is $35, leaving a credit of $465 on the amount of the bid—$7,020—making the amount $6,555, and will advise a decree for specific performance upon the payment of that amount, but, under the circumstances, without costs.

